UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

───────────────────────────────────────────────

Maxim Solutions, LLC,                    Case No. 21-cv-1641 (WMW/DJF)

                    Plaintiff,

                                         **ORDER**

      v.

Bongards' Creameries, *doing business as*
Bongards Premium Cheese,

                    Defendant.

───────────────────────────────────────────────

This breach-of-contract matter is before the Court on Plaintiff Maxim Solutions,
LLC's (Maxim) motion for partial summary judgment against Defendant Bongards'
Creameries, doing business as Bongards Premium Cheese (Bongards), and Maxim's
motion to exclude the opinions and testimony of Bongards' expert Thorsten Bornholdt.
(Dkts. 27, 34).  For the reasons addressed below, Maxim's *Daubert* motion to exclude the
expert testimony of Thorsten Bornholdt is denied and Maxim's motion for partial summary
judgment is granted in part and denied in part as addressed herein.

## BACKGROUND

Maxim is a Wyoming limited liability corporation that provides services relating to
the manufacture and packaging of food and dietary supplements.  Bongards is a Minnesota
dairy cooperative that sells whey protein products.

Maxim began purchasing whey protein products from Bongards in late 2020 to use
in its client's Nectar-brand protein products.  Maxim manufactures products for Nectar by

taking pre-blends—which are small amounts of ingredients such as coloring, sucrose and flavorings unique to each product—and mixing the pre-blends with whey protein isolate (WPI) to create a final blended product.  After initially purchasing another type of whey-protein product from Bongards, Maxim contacted Bongards on October 6, 2020, to discuss purchasing WPI that met its specifications and to request samples.  Bongards supplied the requested samples, and Maxim subsequently asked Bongards to confirm the availability and pricing for two truckloads of WPI.  The parties reached an agreement on a pricing and delivery schedule for the WPI in November 2020.

Several days later, Bongards sent Maxim a proposed Purchase Agreement (Agreement) that includes general terms and conditions.  In relevant part, the Agreement includes provisions disclaiming warranties, express or implied, as well as limitations on Bongards' liability.  After receiving the Agreement, Maxim requested that Bongards make several changes, such as removing the indemnification clause and clarifying the amount of WPI listed in the contract.  Bongards refused to make Maxim's requested changes, explaining that "[t]his is the form we use and won't change.  Feel free not to sign and send back."  Maxim responded that it needed to discuss the contract with upper management and would get back to Bongards.  Later that day, Bongards told Maxim that Maxim could still purchase Bongards' protein powder by continuing to issue purchase orders without executing the Agreement.

Although the Agreement was never executed, Maxim subsequently sent six purchase orders to Bongards on November 12, 2020, two of which were for 37,000 pounds each of WPI that Maxim needed for the first quarter of 2021.  The orders requested

"instant" WPI, which is not defined in the purchase orders.  Bongards confirmed that the purchase orders were received and advised that it would confirm the dates for delivery.

On January 28, 2021, Maxim confirmed that the one-pound WPI sample received from Bongards in advance of the full shipment had "been tested and approved for taste and mixability."   Maxim's testing process involved checking the WPI for taste, smell, appearance, protein content and mixability.  The mixability of the WPI was measured by pouring the WPI into a mixing cup with refrigerated water and then mixing the cup with a spoon for 20 seconds.  Maxim's mixability test did not include mixing the WPI with the pre-blend mixtures that Maxim uses to create its final Nectar products.

The day after Maxim approved Bongards' WPI sample, Bongards shipped approximately 37,000 pounds of WPI to fulfill Maxim's first purchase order.  Bongards also issued an invoice with terms and conditions similar to those in the unsigned Agreement, including sections disclaiming express or implied warranties and limiting Bongards' liability.  The invoice states that "the Agreement of Bongards to enter into the transaction that is the subject of this invoice is expressly limited to the terms appearing on this page plus the 'General Terms and Conditions' appearing on the next page."  Maxim did not object to the terms and conditions before paying the invoice on February 3, 2021.  Bongards accepted the payment.  Bongards shipped the second truckload of roughly 37,000 pounds of WPI on March 16, 2021, after Maxim had again approved a one-pound pre-shipment sample.  Bongards issued a second invoice that included the same terms and

conditions as the first invoice.  Maxim paid the invoice shortly thereafter, and Bongards accepted the payment.

In June 2021, Maxim informed Bongards that several portions of the WPI that Bongards shipped had mixability issues that forced Maxim to reject some, but not all, of the final Nectar product blends.[1]  Maxim explained that it tests the mixability of every Nectar product blend by adding 26 grams of the finished product to 8 ounces of cold water and stirring with a spoon for 20 seconds.  Maxim then pours the solution onto a mesh screen to observe any clumps that formed during the mixing process.  A Nectar product blend passes the mixability test when there are few or no clumps on the screen or in the sink.

Maxim sent Bongards the blended products that had failed Maxim's mixability test, which Bongards then tested.  In an email to Maxim, Bongards explained all of Bongards' WPI performed as expected in Bongards' testing and opined that Bongards' WPI did not cause the mixability issue.  Bongards also observed that the pH of Maxim's samples of unmixable Nectar product blends were in the range of 4.35-4.46, which may have caused the mixability problems.

Maxim subsequently commenced this breach-of-contract lawsuit, asserting that Bongards' WPI caused the mixability issues that resulted in the failed Nectar product. Maxim now moves for partial summary judgment and to exclude Bongards' expert, Thorsten Bornholdt.

---

[1]    The rejected product blends included blends for multiple citrus-flavored products as well as Nectar's Chocolate Truffle flavor.

<u>**ANALYSIS**</u>

**I.      Motion to Exclude Bornholdt's Expert Testimony**

As a threshold matter, Maxim moves to exclude the opinions and testimony of Bongards' expert, Thorsten Bornholdt.  Bongards retained Bornholdt to opine about factors that reduce mixability of WPI when blended with other products.

The admissibility of expert testimony is an issue of law and is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.

The proponent of expert testimony must prove its admissibility by a preponderance of the evidence.  *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).  "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony" and favors admissibility over exclusion.  *Id.* (internal quotation marks omitted).

Determinations as to the admissibility of expert testimony are within a district court's discretion. *See Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997).

Expert testimony is not admissible if it is "speculative, unsupported by sufficient facts, or contrary to the facts of the case," *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006), such that it is "so fundamentally unsupported that it can offer no assistance to the jury," *Minn. Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (internal quotation marks omitted). Disputes about the factual basis of an expert's testimony ordinarily implicate the credibility—not the admissibility—of the testimony. *Sappington v. Skyjack, Inc.*, 512 F.3d 440, 450 (8th Cir. 2008); *see also Bonner v. ISP Techs. Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001). Expert testimony may be excluded, however, when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The objective of the *Daubert* inquiry is to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). To that end, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co.*, 522 U.S. at 146. When weighing the *Daubert* factors, a district court functions as a gatekeeper to separate "expert opinion evidence based on 'good

grounds' from subjective speculation that masquerades as scientific knowledge." *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

Maxim does not dispute Bornholdt's qualifications.  Instead, Maxim argues that Bornholdt's opinions are unreliable because they are supported by irrelevant or unreliable information.  The Court addresses in turn Maxim's arguments as to the admissibility of each of Bornholdt's opinions.

### A.      Bornholdt's Opinion Regarding Mixability of Maxim's Fruit-Flavored Nectar Products

Maxim first disputes Bornholdt's opinion that "the low mixability of Maxim's fruit-flavored product was caused by the high acidity of their citrus flavor components" in the pre-blend added to the fruit-flavored Nectar products.  Maxim argues that Bornholdt's reliance exclusively on one article, "Whey Proteins Solubility as Functions of Temperature and pH" (Solubility Article), to support his expert opinion renders Bornholdt's opinion insufficiently reliable.  In addition, Maxim contends that the Solubility Article is irrelevant to the issues in this case because the article addresses solubility rather than mixability and includes an experiment conducted at a different water temperature than Maxim's mixability test.

Bongards contends that Bornholdt's opinion is sufficiently reliable and disputes Maxim's characterization that Bornholdt reviewed only one scholarly article to support his conclusion.  Instead, Bongards explains that Bornholdt reviewed videos and documentation relating to Bongards' testing of the failed product blends, reviewed multiple depositions and supporting documents and relied on both scholarly articles and his 30 years of

experience addressing mixability issues to form his opinions.  Notably, Bornholdt clarified in his deposition that his opinions in the case are largely based on his prior experience rather than one particular scholarly article.

Maxim's *Daubert* motion contests Bornholdt's reliance on the Solubility Article. Bornholdt's opinion, Maxim argues, is not sufficiently connected to the Solubility Article to be reliable, in light of the different facts in this case.  As Bornholdt explained in his deposition, however, rates of solubility are on a continuum ranging from insoluble, meaning something will not dissolve, to soluble, meaning the product can fully dissolve. Mixability, also referred to as dispersibility, is somewhere on the continuum between insoluble and soluble because mixability means something will disperse in the liquid but may not fully dissolve.  Given that mixability is a certain level of solubility, the effect of pH values and temperature on solubility described in the Solubility Article are sufficiently related to Bonholdt's assessment of whether the pH values of the pre-blend products affected the mixability of the Nectar product blends in this case.  *Cf. Gen. Elec. Co.*, 522 U.S. at 146.

Although differences between the Solubility Article's analysis and the mixability analysis in this case provide avenues for Maxim to explore on cross-examination, the Court finds that the Solubility Article is sufficiently related to Bornholdt's opinion to assist Bornholdt in forming his conclusions in this case, particularly in light of Rule 702's predisposition to finding expert testimony admissible.  *See Lauzon*, 270 F.3d at 686; *Marmo*, 457 F.3d at 758 (explaining that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility").

The factual basis of an expert's opinion goes to the credibility of the testimony, not the admissibility of the opinion. *Sappington*, 512 F.3d at 450. "Only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner*, 259 F.3d at 929–30.

The issues raised in Maxim's *Daubert* motion largely contest whether the analysis Bornholdt conducted is sufficiently related to or distinguishable from the particular facts in this case. Variations between the testing and analysis conducted by a proposed expert and the exact facts of the case do not necessarily render the expert's testimony unreliable under Rule 702. *Sappington*, 512 F.3d at 449–50. In a similar circumstance, the *Sappington* court described the *Daubert* motion as disputing the factual basis of the expert opinion and concluded that questions regarding the factual basis of an expert's testimony implicate the weight of the testimony, rather than its admissibility. *Id.* at 450. Here, as in *Sappington*, Maxim seeks to exclude an expert based on the factual basis of the expert's analysis. The appropriate time to challenge such factual issues is during cross-examination. *Id.*

Accordingly, Maxim's *Daubert* motion is denied as to Bornholdt's opinion regarding the mixability of Maxim's fruit-flavored Nectar products.

## B.    Bornholdt's Opinion Regarding the Failed Nectar Chocolate Truffle Product

Maxim also challenges Bornholdt's opinion that the failed Nectar Chocolate Truffle product blend is attributable to the cocoa powder used in the mixture, rather than Bongards' WPI. Maxim argues that because Bornholdt did not test the exact raw cocoa powder used

in Maxim's product and did not perform the same mixing process, his opinion is irrelevant and inadmissible.  Bongards responds that there are multiple ways to test the mixability issue, and Bornholdt's choice to use an alternative test does not render his opinion irrelevant.  Maxim's arguments address the quality of Bornholdt's factual foundation and go to the weight of Bornholdt's testimony rather than its admissibility, Bongards contends.

Maxim argues that Bornholdt's conclusions are insufficiently tied to the specific facts of the case, as Bornholdt used a different cocoa powder and mixing process in his testing.  But Maxim does not dispute that Bornholdt employed a standard method for assessing mixability.  Instead, Maxim focuses on variations between Bornholdt's mixability experiments and Maxim's mixability test.  As explained above, the factual basis of the expert's opinion implicates the weight and credibility of the expert's testimony, not its admissibility.  *Bonner*, 259 F.3d at 929–30; *Sappington*, 512 F.3d at 449–50.

Because Maxim's argument again pertains to disputes as to the weight and credibility of Bornholdt's opinions, Maxim's *Daubert* motion to exclude this aspect of Bornholdt's testimony is denied.

## II.     Motion for Partial Summary Judgment

Summary judgment is proper when the record before the district court establishes that there is "no genuine dispute as to any material fact" and the moving party is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of a material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, a district court construes the evidence in the

light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *See Windstream Corp. v. Da Gragnano*, 757 F.3d 798, 802–03 (8th Cir. 2014). When asserting that a fact is genuinely disputed, the nonmoving party must "submit affidavits, depositions, answers to interrogatories, or admissions on file and designate specific facts" in support of that assertion. *Gander Mountain Co. v. Cabela's, Inc.*, 540 F.3d 827, 831–32 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(c)(1)(A). A nonmoving party may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted).

Here, Maxim seeks summary judgment on its claims for breach of contract and breach of the implied warranty of merchantability. Maxim also moves for summary judgment on Bongards' affirmative defenses.

## A.    Breach-of-Contract Claim

Maxim moves for summary judgment on its breach-of-contract claim. Although the parties' agreements do not address choice of law issues, both Minnesota (Bongards' primary place of business) and Missouri (Maxim's primary place of business) have adopted all relevant sections of Article 2 of the Uniform Commercial Code (UCC).[2] In addition, both parties agree that the dispute is governed by Article 2 of the UCC. Because the relevant UCC portions are identical in both jurisdictions, the Court need not engage in a

---

[2]    The Court cites to the Second Article of the UCC, which has been adopted in both relevant jurisdictions.

choice of law analysis.  *See Simmons Foods, Inc. v. Hill's Pet Nutrition, Inc*., 270 F.3d 723, 726 n.2 (8th Cir. 2001).

To prevail on a breach-of-contract claim, Maxim must prove four elements under the UCC:  formation, performance, breach and damages.  *Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp. L.L.C.*, 635 F.3d 1106, 1108 (8th Cir. 2011) (*per curiam*).  Here, the parties agree that a valid contract was formed[3] and that the parties performed in accordance with their contracts.  But the parties dispute whether there is record evidence that Bongards breached the contract and whether Maxim suffered damages as a result.

### 1.    Breach

Under the UCC, "[t]he burden is on the buyer to establish any breach with respect to the goods accepted."  UCC § 2–607(4).  Maxim asserts that Bongards breached the contract by delivering WPI that was not "instant," which Maxim defines as WPI that, when blended with other ingredients to produce a final product, would disperse into liquid by stirring with a spoon.  Bongards argues that it has not breached the contract, both because Maxim misinterprets the term "instant" and because Maxim has not established that Bongards' WPI was the source of the mixability problem.  (Dkt. 46 at 13–14.)

---

[3]    Although the parties agree that a valid contract was formed, they disagree regarding what terms are included in the contract.  Because the applicable terms relate directly to Maxim's breach of the implied warranty of merchantability claim, the arguments addressing under what terms the contract was formed are addressed in that section of this Order.  *See infra* Section II.B.  Pursuant to its conclusions below, the Court analyzes the breach-of-contract claim using the purchase orders as the relevant contract.

### a.    Definition of "Instant"

Maxim and Bongards dispute whether Bongards breached the contract by failing to supply "instant" WPI to Maxim.  Maxim argues that Bongards' WPI was not "instant" because it would not disperse into liquid by stirring with a spoon when blended with other products.  Bongards argues that the term "instant" refers only to the WPI itself, not how the WPI will react when combined with other ingredients post-sale.  Bongards also argues that, if the definition of "instant" is ambiguous, the ambiguity in the term precludes summary judgment.

"The interpretation of an unambiguous contract, as well as the determination of whether a contract is ambiguous, present questions of law for the district court." *S. Minn. Beet Sugar Coop. v. Agri Sys.*, 427 F. Supp. 3d 1026, 1032 (D. Minn. 2019).  "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn. 2003) (quotation omitted).  In determining whether a contract provision is ambiguous, district courts are to read contract terms "within the context of the entire contract" and should "give meaning to all" of the contracts' provisions. *Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).

Here, the term "instant" is undefined in the purchase orders or in any other documents the parties exchanged.  Nor does either party provide any other clarifications or instructions that could inform the Court's interpretation of the term "instant."  However, the plain meaning of "instant" is "premixed or precooked for easy final preparation," "appearing in or as if in ready to use form" or "immediately soluble in water." *Instant*,

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/instant (last visited Feb. 9, 2023).

Although both parties assert that the term "instant" is unambiguous, the multiple definitions of the term render it ambiguous. For example, if "instant" means "appearing in or as if in ready to use final form," then Maxim's definition of "instant" as requiring the WPI mix properly with its pre-blend is reasonable. In contrast, if "instant" is defined as immediately soluble in water, then Bongards' interpretation is reasonable. Because there are multiple reasonable interpretations of the term "instant," the question of breach is a disputed issue of material fact. *Denelsbeck*, 666 N.W.2d at 346 (stating that a contract term is ambiguous when it is subject to more than one reasonable interpretation). Therefore, whether Bongards breached the contract by supplying non-instant WPI involves a disputed question of material fact which precludes summary judgment. *See Bank Midwest, Minn., Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn. 2004) (explaining that "[s]ummary judgment is inappropriate when the terms of a contract are at issue and those terms are ambiguous or uncertain").

For these reasons, the Court declines to grant summary judgment on Maxim's breach-of-contract claim because the term "instant" is ambiguous.

### b.     WPI as Source of Mixability Problems

Bongards also argues that summary judgment is inappropriate because whether the failed Nectar product blend is due to inconsistency in Bongards' WPI is a question of fact. Maxim responds that Bongards cannot identify any reasonable explanation for the Nectar product blend failure other than inconsistency in its WPI. In particular, Maxim argues,

Bongards' expert theory—that Maxim's final product failed because of differences in the pH levels of the WPI and the fruity flavor Nectar pre-blends—is insufficiently reliable to be considered and cannot establish a dispute of material fact.

For the reasons addressed above, Maxim has not established that the opinion testimony of Bongards' expert Bornholdt should be excluded. Bornholdt's alternative theory on mixability provides a reasonable alternative explanation for the source of Maxim's mixability problems. Because there is a reasonable alternative explanation, there is a dispute of material fact as to whether Bongards' WPI caused the mixability problems.

For these reasons, the Court also denies summary judgment on the question of whether Bongards' WPI was responsible for Maxim's mixability problems.

### 2.    Damages

Even if Maxim could establish that Bongards breached the contract, Maxim also must prove that it was damaged by Bongards' breach to render summary judgment appropriate on its breach of contract claim. Maxim argues that because Bongards presented no evidence to rebut its damages claim, summary judgment is appropriate. In response, Bongards asserts that Maxim has failed to establish damages, because the declaration underlying Maxim's claim includes no supporting documentation and does not fully explain Maxim's damages calculations.

In a breach-of-contract action, the burden is on the plaintiff to prove damages. *Mies Equip., Inc. v. NCI Bldg. Sys., L.P.*, 167 F. Supp. 2d 1077, 1084 (D. Minn. 2001). When a party has provided only limited information to support its damages claim, summary judgment is inappropriate because that party "has failed to carry its burden of presenting

an undisputed factual record" as to the damages that are owed. *Textron Fin. Corp. v. Weeres Indus. Corp.*, No. 10-cv-2070 (JRT/LIB), 2011 WL 2682901, at *11 (D. Minn. June 17, 2011); *see also Big Pop's Fresh La. Seafood, LLC v. Bass Pro, LLC*, 597 F. Supp. 3d 1346, 1351 (W.D. Mo. 2022) ("The amount of damages, if any, incurred by [p]laintiff is a factual issue and not an issue to be resolved on summary judgment.")

Here, Maxim provides a declaration which states that Maxim calculated its damages to be $152,026. However, Maxim's declaration fails to provide sufficient support for its claim, such as the basis for its damages calculations and supporting documentation. Accepting the facts in the light most favorable to Bongards, Maxim's declaration is insufficient to establish that no factual disputes exist as to damages. Therefore, the existence and amount of damages is a question properly submitted to the jury. *See Odens Family Props., LLC v. Twin Cities Stores, Inc.*, 393 F. Supp. 2d 824, 830–31 (D. Minn. 2005) (holding that factual issues precluded summary judgment on the amount of damages).

Because disputes of material fact exist as to damages, the Court denies Maxim's motion for summary judgment on its breach-of-contract claim.

### B.    Maxim's Breach of the Implied Warranty of Merchantability Claim

Maxim argues that summary judgment on its implied-warranty-of-merchantability claim is proper because there is no genuine issue of fact regarding whether Bongards damaged Maxim by shipping it goods of varying quality and kind. Contesting this argument, Bongards contends that the parties' contract specifically excluded express or

implied warranties, including the implied warranty of merchantability.  Bongards asserts that Maxim cannot prevail on its implied warranty of merchantability claim.

The parties do not dispute that a valid contract was formed between them.  Instead, they dispute the source of their contractual obligations—the Agreement, the purchase orders, or the invoices.  If the Agreement or invoices govern, Bongards has disclaimed any implied warranties and Maxim's breach-of-implied-warranty claim fails.  If the purchase orders govern, then Bongards provided an implied warranty of merchantability.  Under that circumstance, Maxim may be entitled to summary judgment on its claim if no other disputes of material fact remain.

### 1.    Contract Formation

#### i.

The parties dispute whether the unsigned Agreement constitutes the contract to which both parties are bound.  Bongards argues that the Agreement constitutes the relevant contract pursuant to UCC § 2–201(3), and Maxim is not entitled to summary judgment on its breach-of-implied-warranty claim in light of the Agreement's waiver of warranties.   In response, Maxim argues that the Agreement does not supply the terms of the contract because the Agreement lacks sufficient detail to constitute a valid offer.

A document cannot constitute a legally valid offer to form a contract when multiple terms remain open for negotiation.  *See Litton Microwave Cooking Prods. v. Leviton Mfg. Co.*, 15 F.3d 790, 795 (8th Cir. 1994); *see also Federal Foam Techs., Inc. v. McGuckin & Pyle, Inc.*, No. 17-cv-0940 (WMW/KMM), 2018 WL 6529499, at *5 (D. Minn. Oct. 11, 2018).  In determining whether the Agreement acted as an offer, the Court can consider

"the completeness of the terms of the suggested bargain." *Nordyne, Inc. v. Int'l Controls & Measurements Corp.*, 262 F.3d 843, 846 (8th Cir. 2001) (citing Restatement (Second) of Contracts, § 26, cmt. c.).

Here, the Agreement provided by Bongards omits necessary terms, including a specific description of the quantity of WPI, any discussion of shipping terms, as well as the timing and location of delivery. When viewed in the light most favorable to Bongards, the facts are insufficient to form a valid contract as too many open terms remain for negotiation. *Cf. id.* (finding offer sufficient when it included quantity, price, time to accept, packaging, shipping and payment terms). For example, the Agreement provides that "two truckloads" of WPI will be delivered. But the Agreement does not specify any measurable amount by weight or size. The Agreement fails to include shipping or delivery terms, such as the timing and location for delivery. These are precisely the sort of ambiguities that render a document insufficient to form a valid contract. *Id.*

Maxim also contends that it neither accepted the Agreement nor demonstrated an intention to be bound by it. The record evidence reflects that Maxim explicitly did not wish to be bound by the terms of the Agreement and only proceeded after assurances from Bongards that it could do so without accepting the Agreement. Although a contract may be formed without all of its terms decided, the parties nonetheless must intend to make a contract. *Litton Microwave Cooking Prods.*, 15 F.3d at 795.

Maxim attempted to resolve the ambiguities in the Agreement. But Maxim declined to proceed with the Agreement after Bongards refused to incorporate its proposed changes. These actions indicate a lack of consent to be bound by the terms of the Agreement. *Id.*

Even when the facts are viewed in the light most favorable to Bongards, Maxim has established that the terms of the Agreement do not govern the parties here because Maxim did not manifest any intention to be bound by such terms.

For these reasons, the Court concludes that the Agreement does not govern the parties in this case.

### ii.

Maxim argues that the two WPI purchase orders Maxim sent to Bongards after refusing to execute the Agreement constitute the contract in this case and supply the terms that bind the parties.  Maxim explains that the two purchase orders were sent to Bongards as an offer, which Bongards subsequently accepted when Bongards stated that the purchase orders were received and Bongards would confirm delivery dates.  Maxim also lists the relevant terms of the purchase orders that included a specific order quantity, the price, a description of the product and shipping requirements, terms and dates.

When a prior document is found not to constitute a legally sufficient offer, a subsequent purchase order from the buyer functions as the first manifestation of assent to be mutually bound.  *Id.*  Once the purchase order is accepted by the seller, the terms of the buyer's purchase order govern the relationship in question.  *Id.*

For these reasons, the Agreement is not a legally sufficient offer.  Therefore, because Maxim subsequently provided two purchase orders that Bongards agreed to, and did, fulfill, the purchase orders constitute the valid contract in this case.  *Id.*  The terms of the purchase orders, which do not waive any implied warranties, govern the parties' conduct in this case.

Therefore, the Court finds that the purchase orders formed the parties' contract, and that under the terms of the purchase orders, Maxim did not waive any implied-warranty-of-merchantability claim.   For these reasons, summary judgment is inappropriate on Maxim's implied-warranty-of-merchantability claim.

**iii.**

Bongards asserts that, even if the purchase orders form the relevant contract, the terms included in the invoices Bongards sent when shipping the WPI are incorporated in that contract as well.   Because Maxim did not object to the exclusion-of-warranties language after receiving the invoices and subsequently paid Bongards, Maxim is now bound by the terms included in the invoices, Bongards contends.   And the waiver of warranties that is included in the terms of the invoices, Bongards argues, defeats Maxim's motion for summary judgment on its implied-warranty-of-merchantability claim.

Without more, the acceptance of goods and payment for them does not constitute acceptance of all the terms in a counter-offer.   *PCS Nitrogen Fertiliser, L.P. v. Christy Refractories, L.L.C.*, 225 F.3d 974, 981 (8th Cir. 2000). Specific and affirmative assent to the counteroffer is necessary for the parties to be bound to the terms at issue.   *Id.*

Although the invoices that Bongards sent were proposed modifications to a previously existing contract, rather than a traditional counteroffer, there is no evidence of Maxim's assent to the terms of Bongards' invoices.   *See id.* (addressing the assent needed for a party to be bound to specific contract terms).   Without more, Maxim's acceptance of the WPI deliveries and paying Bongards for the WPI do not indicate affirmative assent to the terms in Bongards' invoice.   Accordingly, the terms of the invoices are not incorporated

into the contract, and Bongards cannot demonstrate that Maxim agreed to disclaim the implied warranty of merchantability.

For these reasons, the Court concludes that the invoices' terms are not a part of the contract.

### C.    Implied Warranty of Merchantability

Bongards also contends that the presence of genuine disputes of material fact as to whether the WPI supplied by Bongards was damaged or defective preclude summary judgment on Maxim's implied warranty claim.  For the reasons addressed above, Maxim has not established that the opinion testimony of Bongards' expert Bornholdt should be excluded.  Bornholdt's alternative theory provides a reasonable alternative explanation for the source of Maxim's mixability problems other than that Bongards' WPI was damaged or defective.  As genuine disputes of material fact exist, the Court denies summary judgment on Maxim's claim of an implied warranty of merchantability.

### III.    Bongards' Affirmative Defenses

### A.

Maxim seeks summary judgment on Bongards' third through eleventh affirmative defenses.

Because the parties did not agree to exclude implied warranties from their contract, the Court should grant summary judgment on Bongards' third affirmative defense on implied warranties, Maxim contends.  Bongards disputes Maxim's claim, contending that the terms and conditions in both the Agreement and the invoices apply and, therefore, Maxim has disclaimed implied warranties.

For the reasons described above, however, Bongards cannot establish that the parties agreed to exclude the implied warranties of warrantability and fitness for a particular purpose from the contract. The Court, therefore, grants summary judgment in favor of Maxim on Bongards' third affirmative defense.

**B.**

Maxim also argues that, because Bongards has presented no evidence to support its remaining affirmative defenses, Maxim is entitled to summary judgment on affirmative defenses four through eleven.

Maxim contends that Bongards' corporate representative admitted he had no evidence to support affirmative defenses four through seven and eleven. Based on this admission, Maxim argues, Bongards is foreclosed from raising these affirmative defenses at trial. Bongards disagrees, arguing that its corporate representative was deposed before Bornholdt's expert investigation and report. And Bongards contends that summary judgment on their affirmative defenses that attribute liability to others is unwarranted, because Bongards did not have a full picture of the evidence in the case.

Although Bongards offers minimal evidence in favor of its affirmative defenses, a court "should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *In re RFC and RESCAP Liquidating Tr. Action*, 332 F. Supp. 3d 1101, 1175 (D. Minn. 2018). Granting Maxim's summary judgment motion on Bongards' affirmative defenses would require the court to do just that when assessing what caused the mixability. Because the motion for summary judgment requires the Court to address questions of law, not to resolve disputed issues of fact, the Court denies Maxim's

motion for summary judgment on Bongards' fourth through seventh affirmative defenses. *Id.*

Maxim also argues that Bongards' eighth affirmative defense—that the terms and conditions of the contract limit Maxim's recovery—is properly disposed on summary judgment. For the reasons addressed above, Bongards' terms and conditions were not incorporated into the contract between the parties. Therefore, summary judgment is appropriate on Bongards' eighth affirmative defense.

Bongards' ninth affirmative defense asserts that Bongards manufactured the WPI pursuant to the contract. Maxim contends that summary judgment is warranted because Bongards failed to provide the "instant" WPI, as required by the parties' agreement. In light of the Court's analysis and for the reasons addressed above, the term "instant" is ambiguous. Summary judgment is unwarranted on this affirmative defense.

Maxim also seeks summary judgment as to Bongards' tenth affirmative defense, which alleges that Maxim's claims are barred by the doctrine of assumption of risk. Maxim contends that, by testing the pre-shipment samples of Bongards' WPI, Maxim expressly did not assume the risk that the WPI would cause its Nectar products to fail the mixability test. Bongards counters that Maxim's failure to test the WPI with its pre-blend mixtures establishes that Maxim assumed the risk that the final versions of the product would not mix properly. The parties' dispute regarding materials facts that pertain to assumption of risk renders summary judgment inappropriate. Fed. R. Civ. P. 56(a).

Therefore, the Court grants summary judgment as to Bongards' eighth affirmative defense and denies summary judgment as to the additional affirmative defenses addressed herein.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.     Plaintiff Maxim Solutions, LLC's motion to exclude the expert testimony of Defendant's expert Thorsten Bornholdt, (Dkt. 27), is **DENIED**.

2.     Plaintiff Maxim Solutions, LLC's motion for partial summary judgment, (Dkt. 34), is **GRANTED IN PART AND DENIED IN PART** as addressed herein.


Dated:  February 15, 2023                          s/Wilhelmina M. Wright
                                                   Wilhelmina M. Wright
                                                   United States District Judge